IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-----------------------------------------------x
VINCENT VALANZUOLO                   :
                                     :          3:11 CV 1336 (JGM)
V.                                   :
                                     :
CITY OF NEW HAVEN        :              DATE: SEPTEMBER 16 , 2013
-----------------------------------------------x
```

<u>MEMORANDUM OF DECISION</u>

Plaintiff, Vincent Valanzuolo, commenced this action in the Connecticut Superior Court in New Haven on July 25, 2011 against the City of New Haven, which complaint was superseded by an amended complaint filed on August 10, 2011, and then removed to this Court by defendant on August 22, 2011. (Dkt. #1). Plaintiff, a person with a disability of total hearing loss, alleges in his Amended Complaint violations of the Connecticut Fair Employment Practices Act, CONN. GEN. STAT. §§ 46a-58 and 46a-64 (Count One), and the Americans with Disabilities Act ["ADA"], 42 U.S.C. § 12131 <u>et seq.</u> (Count Two), arising out of his arrest pursuant to an arrest warrant from a failure to appear at Housing Court in October 2009. (Dkt. #1, Exh. B).

On November 14, 2011, defendant filed a Motion to Dismiss Count One of the Amended Complaint (Dkt. #19; <u>see</u> Dkts. ## 22, 25), which motion was granted on September 21, 2012 by United States District Judge Janet Bond Arterton, as CONN. GEN. STAT. §§ 46a-58 and 46a-64 do not provide a private cause of action. (Dkt. #38).[1] On October 10, 2012, defendant filed its answer (Dkt. #39). One month later, on November 6, 2012, the parties consented to trial before this Magistrate Judge. (Dkt. #41). On April 29 and 30,

_____

[1]Accordingly, the Court disregards plaintiff's claims in his post-trial brief that the state statutory provisions provide broader protection than the ADA, as those state claims are no longer in this case. (<u>See</u> Dkt. #68, at 1, 10-11 & Appendices).

2013, a bench trial was held at which plaintiff, Mark Stroud, an investigator with the New Haven Livable City Initiative, Michelle Duprey, the Director of the Department of Services for People with Disabilities for the City of New Haven, Reginald Sutton, formerly a Sergeant in the New Haven Police Department, and Joshua Kyle, a patrol officer in the New Haven Police Department, testified.  (See Dkt. #65, Trial Transcript Volume I, Morning, April 29, 2013 ["Tr. Vol. 1, A.M."]; Dkt. #66,  Trial Transcript Volume 2, April 30, 2013 ["Tr. Vol. 2"]; Dkt. #67, Trial Transcript, Volume 1, Afternoon, April 29, 2013 ["Tr. Vol. 1, P.M."]; see also Dkts. ##57-64).[2]

On June 17, 2013, plaintiff filed his post-trial brief (Dkt. #68),[3] and eleven days later, on June 28, 2013, defendant filed its post-trial brief.  (Dkt. #69).[4]

For the reasons set forth below, judgment shall enter in favor of defendant in that plaintiff was provided with effective communication throughout the course of events at issue in this litigation.

## I. FACTUAL FINDINGS

The following constitutes the Court's findings of fact, pursuant to FED. R. CIV. P. 52(a)(1):

Plaintiff, a resident of New Haven, Connecticut since 1964, is profoundly hearing impaired. (Tr. Vol. 1, A.M., at 12, 15). His property at 182 Norton Street, in New Haven, Connecticut is larger than the lots in his neighborhood, encompassing more than half an acre

---

[2]Plaintiff testified with the assistance of two certified sign language interpreters.  (See Tr. Vol. 1, A.M., at 3-4).

[3]Attached to plaintiff's post-trial brief are copies of case law (Appendices One-Three).

[4]Attached are six exhibits: copy of excerpts of the trial transcripts (Exhs. A-B, E; see also Dkts. ##65-67); and copies of case law (Exhs. C-D, F).

of land, bordered by seven neighbors, and there is a fence around the property. (Tr. Vol. 1, A.M., at 12).[5]  Plaintiff's residence has a long driveway, at the end of which is a six-foot high gate with privacy screening. (Id. at 12-13, 78).   Plaintiff has two dogs, which serve as service dogs for plaintiff; they alert plaintiff to knocks at the door, fire alarms, sirens, the noise of vehicles approaching, and any other sounds.  (Id. at 13).

A. PREVIOUS INTERACTIONS WITH THE LIVABLE CITY INITIATIVE

In June 2009, Mark Stroud, a housing code enforcement officer from the New Haven Livable City Initiative ["LCI"], came to plaintiff's house after his office received a complaint regarding plaintiff's property.  (Tr. Vol. 1, A.M., at 13-14, 77-78).[6]  Plaintiff testified that he opened the door, and using a pen and pad that he keeps on his porch, he tried to write down that he needed an interpreter. (Id. at  24, 61; Tr. Vol. 2, at 17).   After meeting plaintiff, Stroud informed his supervisor, Rafael Ramos, that plaintiff is deaf. (Tr. Vol. 1, A.M., at 84). Stroud did not request any special accommodations to communicate with plaintiff because his initial contact with plaintiff involved the use of a pen and paper so Stroud was aware that he could communicate with plaintiff using this method. (Id. at 84-85).

On or about June 19, 2009, plaintiff was sent a letter from the LCI which detailed violations of the Housing Code of New Haven.[7]  (Exh. 1; Tr. Vol. 1, A.M., at 14-15).  Plaintiff was informed that he had twenty-one days to complete compliance with the Housing Code

---

[5]Besides his residence, plaintiff also owns property on Howe Street in New Haven and two parcels of property in Maine to which he travels "periodically."  (Tr. Vol. 1, A.M., at 16).

[6]Stroud testified that the first time he came out to plaintiff's residence, plaintiff was not at home so he observed his property from a neighbor's property.  (Tr. Vol. 1, A.M., at 78-80).  After he completed this inspection, he sent a housing code violation letter to plaintiff.  (Tr. Vol. 1, A.M., at 81).

[7]The letter provides that it was hand delivered by Connecticut State Marshal or New Haven Police Services.  (Exh. 1).

by rectifying the following violations: remove accumulated garbage in the yard; remove accumulated rubbish in the yard, cut tall grass and/or weeds in the yard; remove rodent infestation and harborage in the yard; remove accumulated junk cars; and provide adequate metal garbage containers with tight fitting covers.  (Exh. 1).  Upon receipt of this letter, plaintiff wrote back explaining that he would like to make an appointment to discuss the contents of the letter as he did not understand the letter.[8]  (Tr. Vol. 1, A.M., at 15). Plaintiff testified that he included in his correspondence that he is deaf and he requested that a sign language interpreter be available at the meeting. (Id.). No meeting was held; however, plaintiff acknowledged that at some point he received a handwritten note asking him to call an interpreter.  (Id. at 15-16, 55-57).  Michelle Duprey, the Director of the Department of Services for People with Disabilities for the City of New Haven, arranged for an interpreter through the State Commission on the Deaf and Hearing Impaired. (See Tr. Vol. 1, P.M., at 14-15).  Plaintiff acknowledged that he received a note asking him to contact the interpreter, but, as plaintiff stated, "the City is responsible for getting an interpreter, not me."  (Tr. Vol. 1, A.M., at 55-57; see also id. at 72).

According to plaintiff, Stroud returned again, and this time he was with a "ten year old or a kid" who tried to sign to plaintiff.  (Tr. Vol. 1, A.M., at 17, 74).  Plaintiff testified that he told Stroud to "come with an interpreter, so [that he] could communicate and understand." (Id. at 17). Stroud testified that between June 2009 and January 2010 he went to plaintiff's house a "handful" of times; however, he denied that he ever brought a child with him to plaintiff's house.  (Id. at 85).

On October 1, 2009, around 10:00 p.m., Stroud, along with Sergeant Reynolds and

---

[8]Plaintiff disputes that he had garbage in his yard.  (Tr. Vol. 1, A.M., at 73).  According to plaintiff, he has statues and decorations but not garbage. (Id. at 73-74).

Officer Aponte of the New Haven Police Department, returned to plaintiff's house.  (See Exh. 2; Tr. Vol. 1, A.M., at 17-18, 54, 86-87).  When plaintiff opened his front door, there was a light shining off of the police car that prevented plaintiff from seeing clearly, but he did see Stroud and an officer approaching him.  (Tr. Vol. 1, A.M., at 58).  Stroud showed plaintiff a paper, which was a summons for plaintiff's appearance in Housing Court on October 8, 2009 to answer for the itemized housing violations, but plaintiff responded by writing on a piece of paper that he was deaf and needed an interpreter, as he did not know what the summons was.  (See Exh. 2; see Tr. Vol. 1, A.M., at 58).  He closed the door and Stroud slipped the summons through the door.  (Tr. Vol. 1, A.M., at 58).  According to Stroud, plaintiff did not ask for an interpreter during this visit.  (Id. at 93).  Plaintiff discovered the summons the next morning, after which he sent a letter to the Housing Court address on the summons form, explaining that he is deaf and needs an interpreter, and asking what the summons was for. (Id. at 18-19).   Plaintiff also testified that he informed the Housing Court that he could not make the court date referenced on the summons because he would be in Maine.  (Id. at 20). According to plaintiff, he asked for a postponement, but he acknowledged that he never received a response from the Housing Court telling him that he did not have to show up or that he had a new date.  (Id. at 20, 59).

At some point between October 1 and 20, 2009, Stroud informed the Housing Court Clerk that he served the summons on plaintiff for him to appear, and he gave her a copy of the summons.  (Id. at 87-88).  On October 20, 2009, a warrant was issued when plaintiff failed to appear on that said date.  (Exh. 3). Plaintiff left for Maine and did not return until January 8, 2010.   (Tr. Vol. 1, A.M., at 20, 60).[9]

---

[9]Plaintiff did not have his mail forwarded to his Maine address while he was out of Connecticut.  (Tr. Vol. 1, A.M., at 75).   He testified that he was "going to be there until maybe the

B. EXECUTING THE ARREST WARRANT - JANUARY 8, 2010

Stroud testified that he was contacted by the Housing Court regarding plaintiff's failure to appear in Housing Court, after which, on January 8, 2010, he contacted Sergeant Reginald Sutton,[10] the District Manager for District 10 in New Haven, to execute the outstanding arrest warrant for plaintiff's failure to appear ["FTA"].[11] (Tr. Vol. 1, A.M., at 88-89; Tr. Vol. 2, at 4, 13-14).  Sutton explained that with a FTA warrant, the arrestee is taken into custody, and because Stroud does not have the power to arrest, a police officer was needed.  (Tr. Vol. 2, at 15-16).  Stroud informed Sutton that plaintiff was hearing impaired but that he "did not foresee a problem" based on his previous interaction with him and his ability to communicate with a pen and paper. (Tr. Vol. 1, A.M., at 90-91).

Around 2:00 p.m. on January 8, plaintiff's dogs alerted him to sirens. (Tr. Vol. 1, A.M., at 21).[12]  Plaintiff went to the door where he was greeted by Stroud, Sutton, and a patrol officer who were on plaintiff's porch.[13]  (See Tr. Vol. 1, A.M., at 60-61, 88, 91; see id. at 21-22).  Sutton testified that he showed plaintiff the warrant and he read it over the course of "[m]aybe [one] minute[.]" (Tr. Vol. 2, at 17, 27-28).  Similarly, plaintiff testified that when he opened his door, "there was a gentleman there with a piece of paper.  He was trying to give me the piece of paper." (Tr. Vol. 1, A.M., at 21).  Plaintiff testified that he went to get

---

week before Christmas."  (Id. at 60).

[10]Sutton, a twenty-seven year veteran of the police force, retired from the New Haven Police Department in March 2011. (Tr. Vol. 2, at 4-5, 25).

[11]As a District Manager, Sutton had the same authority as any officer, including the power to arrest. (Tr. Vol. 2, at 9).

[12]While plaintiff was testifying about this incident and its aftermath, he twice asked for a moment to compose himself as he was "dizzy." (Id. at 21, 28).

[13]According to plaintiff, Stroud had come to plaintiff's house about seven times. (Tr. Vol. 1, A.M., at 74).

a piece of paper, and he "wrote down that [he] needed an interpreter, but they grabbed my hands and that's when [he] blacked out." (Id. at 22).[14]  However, Sutton testified that prior to handcuffing plaintiff, the two of them communicated back and forth on pen and paper, which they exchanged approximately three times.  (Tr. Vol. 2, at 21, 28-29, 33).  He wrote that he had a warrant for plaintiff's arrest and he was taking him into custody. (Id. at 29). Sutton does not recall plaintiff requesting an interpreter.  (Id.). Similarly, Stroud testified that there was a "conversation back and forth, Sergeant Sutton explained to [plaintiff], that he would be getting arrested[,]" and that he saw an exchange of notes "go[ing] back and forth[]" between plaintiff and Sutton.   (Tr. Vol. 1, A.M., at 91, 93-94). According to Sutton, it did not occur to him to request an interpreter because he had no other reason to speak to plaintiff; plaintiff knew he was under arrest and it was for a housing code violation so that is not something about which Sutton would question plaintiff. (Tr. Vol. 2, at 21).   Plaintiff denies that there was any "writing back and forth[.]" (Tr. Vol. 1, A.M., at 62).  In Sutton's opinion, plaintiff understood what was happening. (Tr. Vol. 2, at 21).

Stroud testified that after plaintiff was handcuffed, he "lowered himself to the ground and then an ambulance was called to check him out." (Tr. Vol. 1, A.M., at 91, 92).  Similarly, Sutton testified that plaintiff lowered himself to the ground "[w]hile I was handcuffing him."

---

[14]Plaintiff also testified that, "I opened the door and I went to go get a piece of paper to write down that I needed an interpreter but that's when they grabbed my hands. And I remember looking at them grabbing my hands, but after that I blacked out.  I passed out." (Id. at 23).

He continued, "I was trying to write down because I have a piece of paper that I - - and I was trying to write down 'interpreter' when I saw them, but - - I tried to tell them but nothing happened. . . . They had grabbed my hands and that's when I blacked out."  (Id. at 24).

On cross examination, plaintiff clarified that he "was in the midst of writing on a piece of paper[]" that he needed an interpreter when his hands were grabbed.  (Tr. Vol. 1, A.M., at 61). According to plaintiff, he "was writing to ask for an interpreter and that's what [he] wrote down, and nothing happened."  (Id.). He also testified that he first asked for an interpreter, then asked for a lawyer. (Id. at 61-62).

(Tr. Vol. 2, at 30).  Plaintiff believes he remembers walking to an ambulance but he was "very disoriented."[15] (Tr. Vol. 1, A.M., at 24).  Sutton testified that plaintiff was conscious when the ambulance arrived and he remained handcuffed with his hands in front of him when receiving medical attention at the scene and en route to Yale New Haven Hospital ["YNHH"].  (Tr. Vol. 2, at 18-19, 30-31).  Sutton explained that arresting officers have no discretion when executing a FTA warrant, because "the individual [has] already failed to appear in court[ ]" and is "not presented with a second opportunity to fail to appear."  (Tr. Vol. 2, at 22-23, 24, 31-32). Sutton called for another police unit to follow the ambulance and to meet plaintiff at the hospital.  (Id. at 18).  (See also Exh. 10).

C. HOSPITAL STAY

Plaintiff does not remember how he arrived at the hospital but he does remember waking in the hospital with his legs and arms restrained in the hospital bed. (Tr. Vol. 1, A.M., at 24-25; see id. at 63).  Joshua Kyle, a patrol officer for the New Haven Police Department for more than one year at that time, was assigned to guard plaintiff in his hospital bed.  (Tr. Vol. 2, at 35, 43-44, 54; see Tr. Vol. 1, A.M., at 63). Officer Kyle has been with the NHPD since 2008, and has been a patrol officer for approximately three years. (Tr. Vol. 2, at 35). Officer Kyle did not know that plaintiff was deaf before meeting him, and he did not know for what plaintiff was arrested.  (Id. at 36).[16]  Officer Kyle noticed that plaintiff was becoming increasingly "agitated."  (Id. at 37).   He offered plaintiff a pad of paper and pen to

---

[15]Stroud remained at plaintiff's house until the ambulance arrived.   (Tr. Vol. 1, A.M., at 92). He contacted Ramos and told him what had happened, and he called the Housing Court and informed them that plaintiff was arrested.  (Id.).  There is no police report of this incident.  (Id. at 92-93).

[16]Officer Kyle testified that he had training regarding communicating with deaf persons while he was in the police academy.  (Tr. Vol. 2, at 53).

communicate.  (Tr. Vol. 1, A.M., at 25, 63; Tr. Vol. 2, at 37-38 ).  According to plaintiff, because his hands were tied down it was "very difficult" to maneuver his hands to write; he "was specifically writing asking for a live interpreter and nothing happened."  (Tr. Vol. 1, A.M., at 25, 63).   According to Officer Kyle, the two of them communicated back and forth, during which communication Officer Kyle informed plaintiff that he was there because of an arrest warrant but that he did not know why plaintiff was arrested.  (Tr. Vol. 2, at 38). Plaintiff asked Officer Kyle several times why he was arrested.  (Id.).  Plaintiff also wrote that he was concerned about his father and his dogs, and he asked Officer Kyle to contact Detective Billy White, who knew plaintiff, but White was no longer with the police force.  (Tr. Vol. 2, at 38-39, 63-64; Tr. Vol. 1, A.M., at 63-64).[17]  Officer Kyle testified that they "went back and forth for a while" until plaintiff "became frustrated and threw the pen and paper at me."  (Tr. Vol. 2, at 38-39).  According to Officer Kyle, in addition to getting frustrated with him, he saw plaintiff become frustrated with the doctor.  (Id. at 39).

Officer Kyle explained the process to plaintiff, that he would go to the lock up, and depending on the charge, he could be released on a promise to appear or he would have to wait to be seen by a judge.  (Id. at 50).  He also told plaintiff there was a possibility he could get released without a bond. (Id. at 50-51). Officer Kyle wrote that plaintiff would go in a van and go to 1 Union Avenue (the New Haven Police Department headquarters) for processing.

---

[17]In October 2007, Detective Billy White, who had been Supervisor of the Narcotics Enforcement Unit for the New Haven Police Department, plea guilty to conspiracy to commit bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 371 and theft of government property in violation of 18 U.S.C. § 641, and was sentenced to prison for thirty-eight months in April 2008.  See U.S. v. William White, 07 CR 89 (JBA).  Detective White's arrest, guilty plea and sentencing received extensive coverage in the local media.

It is for that reason that Office Kyle thought plaintiff was being sarcastic to him when plaintiff mentioned White.  (Tr. Vol. 2, at 38-39)(Kyle thought plaintiff was "poking a stab at [him]" because of Billy White's "incident[.]")

(Id. at 52). According to Officer Kyle, who had been sitting with plaintiff for about five hours,[18] they wrote on three or four pages of Officer Kyle's police pad, and filled an entire sheet of paper that the nursing staff provided. (Id. at 51). Plaintiff wrote in complete sentences with proper spelling and they communicated until Kyle told plaintiff that he would be transported to Union Avenue for processing, at which time plaintiff became agitated and threw the pen and paper. (Id. at 39, 52).

Plaintiff testified that he tried to write that he needed an American Sign Language ["ASL"] interpreter, but there was a "miscommunication" and the hospital provided plaintiff with a video machine instead. (Tr. Vol. 1, A.M., at 26, 127). His arm restraints were removed so that he could sign, but the video feed kept breaking up so that he could not make use of the machine. (Id. at 27, 65-66; Tr. Vol. 2, at 40). Plaintiff was "confused[,]" "very upset[,]" and he was "panicking." (Tr. Vol. 1, A.M., at 65). Officer Kyle testified that plaintiff would not provide all of his medical information to the doctor trying to treat him, and the doctor became frustrated and told plaintiff that she would not communicate with him until a live interpreter arrived. (Tr. Vol. 2, at 40). It was "probably like four or five hours later[]" that the live interpreter arrived. (Id.).

Plaintiff testified that over the course of the ten hours that he was restrained in a hospital bed, no one told him why he was arrested, so that he was panicking and scared, to the point that he felt his heart pounding and was afraid that he would die. (Tr. Vol. 1, A.M., at 27, 29). Later that night, he was informed that he was to be admitted because of heart problems, and at that point, an ASL interpreter was present who informed him that he was

_____

[18]As discussed below, plaintiff testified that he was there for ten hours. (Tr. Vol. 1, A.M., at 27).

to be transferred to the seventh floor. (Id. at 29, 64).[19]  Plaintiff was concerned about how he would communicate when he was restrained and he was concerned for his dogs and his elderly father, so he signed himself out against medical advice.  (Id. at 29; see id. at 28). (See also Exh. 5).

### D. VAN TRANSPORT TO UNION AVENUE DETENTION FACILITY

Once plaintiff signed himself out of YNHH, he was handcuffed with his hands in front of him and escorted to the back of a police car outside of the hospital.  (Tr. Vol. 1, A.M., at 30; Tr. Vol. 2, at 41). Officer Kyle called for the police van. (Tr. Vol. 2, at 41).   Plaintiff testified that he thought he was going home.  (Tr. Vol. 1, A.M., at 30-31).  However, he sat in the back seat of the police car for about fifteen minutes and then was put into the back of a police van.   (Id. at 31; see Tr. Vol. 2, at 41-42). Plaintiff resisted going into the van, he "motion[ed] that [he] didn't want to go in there, but [he] was pushed in . . . and then they closed the door behind [him]. [Plaintiff] became very scared."  (Tr. Vol. 1, A.M., at 31-32). Officer Kyle, however, did not recall anything out of the ordinary occurring when plaintiff was placed in the van.  (Tr. Vol. 2, at 42).

Once he was inside the van, plaintiff was very scared and his heart was racing.  (Tr. Vol. 1, A.M., at 32).  He thought that gas was coming out of the vents in the van and he started banging on the sides for help.  (Id.).  He felt like he was in the van for an hour in the parking lot of the hospital. (Id. at 32-33).  At that point, no one was communicating with him. (Id. at 33). Eventually he felt the vibration of the van moving.  (Id.).  In his state of fear, he

---

[19]Plaintiff initially testified that an ASL interpreter was present at that point "finally" (id. at 29), but he later testified that YNHH never provided him with a live interpreter.  (Id. at 65). However, as just indicated, Office Kyle testified that an ASL interpreter arrived "probably like four to five hours" after plaintiff was admitted at the hospital (Tr. Vol. 2, at 40), and in his post-trial brief, plaintiff concedes that such an interpreter was present.  (Dkt. #68, at 4, 11).

lost control of his bodily functions. (Id.).

When the doors to the van opened again after the trip (which was less than one mile),[20] plaintiff was at the detention facility that is run by the Judicial Marshals of the Connecticut Judicial Department, and not the New Haven Police Department. (Id. at 33, 75; Tr. Vol. 2, at 30-31, 42, 55).[21] Plaintiff kept asking for an interpreter but in response, he was given the "wait-a-minute finger." (Tr. Vol. 1, A.M., at 33-34).   Plaintiff was trying to communicate but could not, although, as plaintiff testified, "if [he] . . . read his lips correctly[,]" eventually a "boy" who did the fingerprinting spoke to another officer and told that officer that plaintiff is deaf and needed paper.   (Id. at 33-34, 66-67).   At about 2:00 a.m., plaintiff's brother arrived, paid the $250.00 bail, and brought plaintiff home.[22]   (Id. at 34-35, 38).

### E. AFTER THE INCIDENT

Right after this incident, plaintiff began seeing a mental health counselor, Susan Guerrecci,[23] because he "was so disturbed about what happened in the van"; he began taking Zoloft.[24] (Tr. Vol. 1, A.M., at 47-49, 67; see also Exhs. 8, 11).  Plaintiff testified that when in

---

[20]According to www.mapquest.com, the distance between the main entrance of Yale-New Haven Hospital, at 20 York Street (Tr. Vol. 2, at 35; Exh. 5), and the New Haven Police Headquarters, at 1 Union Avenue (id. at 30-31, 42), is 0.78 miles, and is a two-minute ride in ordinary traffic.

[21]See note 27 infra.

[22]A few hours later, plaintiff went to the Hospital of St. Raphael because he had chest pain and his shoulder was hurting him.   (Id. at 35-36). He was "[i]n and out" of the hospital for a week, seeing "doctors upon doctors."  (Id. at 37).   (See also Exhs. 6-7).

[23]Plaintiff testified that he discussed many personal issues with Guerrecci, in addition to this incident.  (Id. at 67-70; see also Exhs. 8, 11).

[24]Plaintiff testified that he already was taking Tramazon, Lisinopril, and two other medications, but Zoloft was newly prescribed after this incident; he also testified that he was taking Sertraline (which is the generic version of Zoloft).  (Id. at 48-49).  (See also Exh. 8).

the van, he "felt like [he] was in a coffin or being buried or something[,]" "[t]here was no communication, absolutely none, and [he] was [petrified]." (Tr. Vol. 1, A.M., at 68). He was "confused" and "disoriented." (Id. at 51). It was "just terrifying. Just being in that van not being able to be heard, to communicate." (Id. at 39). He felt like he "was caving in. It was a very traumatic experience." (Id. at 70). Plaintiff was in "a lot of physical pain" and he had "pain in [his] chest." (Id. at 51).

Plaintiff eventually went to court and learned that his arrest arose out of a housing case, which was later dismissed. (Id. at 37, 39). Plaintiff had moved some cars, removed some bamboo from the property, and cut some grass on his property. (Id. at 39).

### F. NEW HAVEN POLICE DEPARTMENT TRAINING

Michelle Duprey, the Director of the Department of Services for Persons with Disabilities for the City of New Haven for the past fifteen years, testified that she, in her role as a certified law enforcement instructor, trains New Haven Police Department academy enrollees and existing officers on issues of special needs. (Tr. Vol. 1, P.M., at 5-11; see Exhs. 9, A-E). Similarly, Sutton testified that he recalls that over the course of his career, he received in-service training for dealing with hearing impaired citizens from Ms. Duprey. (Tr. Vol. 2, at 5-9; see also Tr. Vol. 1, P.M., at 7). After plaintiff's arrest, plaintiff contacted Ms. Duprey and about a week later, she met with him, along with an ASL interpreter. (Tr. Vol. 1, P.M., at 12-13). After plaintiff told her about his arrest, his experience at YNHH, and the subsequent booking, Ms. Duprey contacted the Police Chief and asked him to assist her in finding out what happened. (Id. at 13-14). They were conducting an inquiry into this matter when the Complaint in this case was filed, at which point, Ms. Duprey's office was removed from the investigation. (Id. at 14).

Ms. Duprey testified that with hearing impaired persons, "[s]ometimes you can ask

basic questions using a pen and paper[;]" she also testified that she recommends that City employees "ask the deaf person what is the best way for them to communicate[.]" (Tr. Vol. 1, P.M., at 18).  She also testified that the City of New Haven has a portable assistive hearing device that amplifies sound, but added that there is now an "app" on the iPhone "that does the same thing[.]'" (Id. at 16-17).

## II. CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law pursuant to FED. R. CIV. P. 52(a)(1):

Title II of the Americans with Disabilities Act ["ADA"] provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The statute "require[s] that covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities." Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003)(internal quotations & citation omitted).   The purpose of the Act is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998)(citations omitted).

In order for plaintiff to prove a violation of Title II, he must establish: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in or denied the benefits of the City of New Haven's services, programs or activities, or was otherwise discriminated against by the City of New Haven; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability.  Hargrave v. Vermont, 340 F.3d

14

27, 34-35 (2d Cir. 2003)(citation omitted). Under the ADA, a plaintiff must show that the

discrimination was intentionally directed to him or her in particular, and if this burden is met,

the burden then shifts to the defendant to "show that the accommodation provided was

either effective or that the accommodation sought and not provided would have resulted in

a fundamental alteration of necessary procedures or an undue financial or administrative

burden."  Ryan v. Vermont State Police, 667 F. Supp. 2d 378, 386 (D. Vt. 2009), citing

Tennessee v. Lane, 541 U.S. 509 (2004)["Lane"].  In this case, it is undisputed that plaintiff's

hearing impairment makes him a "qualified individual" under the Act.  Plaintiff alleges that

the City denied him a sign language interpreter which would have allowed him to effectively

communicate with the police.

A. ARREST

The "Second Circuit has not addressed the issue of whether an arrest itself is a

'program, service or activity' covered by the ADA . . . ."  Ryan, 667 F. Supp. 2d at 386

(citation omitted).  That said, courts have generally recognized, and distinguished, two types

of claims under Title II: a wrongful arrest based on a person's disability, and not for any

criminal activity, and a claim that involves a proper arrest but a failure to reasonably

accommodate a disability during the arrest, causing the arrestee "to suffer greater injury or

indignity than other arrestees."  Id. at 387 (multiple citations omitted).  In this case, it is

clearly established that plaintiff's arrest was pursuant to a FTA warrant and in a FTA scenario,

the arresting officer has no discretion over whether or not to effectuate the arrest.  (See Tr.

Vol. 2, at 15-16 (Sutton explained that with a FTA warrant, the arrestee is taken into

custody); see also id. at 22-23, 24, 31 (Sutton further explained that arresting officers have

no discretion when executing a FTA warrant, because "the individual[] [has] already failed

to appear in court[ ]" and is "not presented with a second opportunity to fail to appear.")).

Thus, there is no evidence that this case involves an arrest based on plaintiff's disability, but rather, this case involves a proper arrest and a question of whether the City of New Haven failed to reasonably accommodate plaintiff during the arrest, causing plaintiff to "suffer greater injury or indignity than other arrestees." Ryan, 667 F. Supp. 2d at 386 (multiple citations omitted).

### B. FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS

Under the ADA, law enforcement officers have a duty to "provide arrestees who are disabled with reasonable accommodations once an arrest of a disabled person had been accomplished." Ryan, 667 F. Supp. 2d at 389. Moreover, case law supports a finding that the ADA applies to post-arrest detention, see Tucker v. Tennessee, 539 F.3d 526, 533 (6th Cir. 2008), cert. denied sub nom.,Tucker v. Hardin Cnty., 558 U.S. 816 (2009), and to police transportation of the arrestee from the scene to the police station. See Gorman v. Bartch, 152 F.3d 907, 912-14 (8th Cir. 1998). In the case of a hearing impaired individual, the question becomes whether appropriate auxiliary aids were provided. See Tucker, 539 F.3d at 533. Under Title II, "auxiliary aids and services" include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12102(1)(A).[25] However, "Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities . . . . It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided . . . [or] impose an undue financial or administrative burden[.]" Lane,

---

[25]Further, the Appendix to the DOJ Regulation § 35.160 states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A; see also 28 C.F.R. § 35.160(b)(2)("In determining what type of auxiliary aid and service are necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.").

541 U.S. at 531-32.

The "reasonable-modification inquiry in Title II-ADA cases is a 'highly fact-specific inquiry.'" Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1085 (11th Cir. 2007), quoting Holbrook v. City of Alpharetta, 112 F.3d 1522, 1527 (11th Cir. 1997).  Bearing the necessity of this factual analysis in mind, the Court turns to the many cases on point involving arrests of those with hearing impairments.

In Tucker, deaf mute arrestees sued defendant after they were arrested on a domestic dispute and the officers communicated by pen and paper rather than with the assistance of an interpreter. 539 F.3d at 528.  After their arrest, the jail lacked the TDD/TTY telephone technology requested by the arrestees, but communication was effectuated through relay interpreters. Id. at 529.  The Sixth Circuit held that the use of pen and paper was a reasonable accommodation in lieu of other auxiliary aids when there was evidence that "an effective means of communication" was provided. Id. at 537.  The Sixth Circuit observed that while plaintiffs claimed that the City Police failed to provide effective communication because of a lack of an interpreter, plaintiffs also conceded that they were effectively communicating with the officers, and there was "no evidence that the provision of auxiliary aids, i.e., a sign language interpreter would have changed the events in any way." Id. at 536 (citation omitted).  Additionally, there was no evidence that those plaintiffs were "intentionally discriminated against because of their hearing impairment" during the post-arrest detention. Id. at 537 (emphasis omitted).  While the jail did not have TTY telephones, plaintiffs were provided relay operators as an effective means of communication. Id.  The Sixth Circuit refused to "find strict liability simply because the jail failed to provide exactly the auxiliary device [the plaintiffs] requested[]." Id.

Similarly, in a case involving a hearing impaired person arrested on a DUI charge after

being denied an interpreter or "someone to help [him] out[,]" the Eleventh Circuit held that even if the hearing impaired plaintiff requested an interpreter during his field sobriety test on a DUI stop, exigent circumstances existed, and the plaintiff admitted that he could read lips. Bircoll, 480 F.3d at 1076-78, 1086.   The Eleventh Circuit continued, "[w]hile communication may not have been perfect," by his own admission, plaintiff understood that he was being asked to perform field sobriety tests, and that he tried to perform those tests, so that plaintiff failed to state an ADA claim. Id. at 1086-87.

As the Eleventh Circuit explained in Bircoll, "[w]hat steps are reasonably necessary to establish effective communication with a hearing-impaired person" depend on the factual circumstances of the case, including, but are not limited to:

> (1) the abilities of, and the usual and preferred method of communication used by, the hearing-impaired arrestee;
>
> (2) the nature of the criminal activity involved and the importance, complexity, context, and duration of the police communication at issue;
>
> (3) the location of the communication and whether it is a one-on-one communication; and
>
> (4) whether the arrestee's requested method of communication imposes an undue burden or fundamental change and whether another effective, but non-burdensome, method of communication exists.

480 F.3d at 1087.   "In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication."   Id.

Relying upon Bircoll, U.S. Magistrate Judge John M. Conroy in our sister district court in Vermont applied the foregoing factors to the facts of the Ryan case. See Ryan, 667 F. Supp. 2d at 389-90.   In that case, Ryan, a deaf amputee, was arrested for hindering a law enforcement officer, after which he was transported to the police barracks where he was read the citation, he was observed putting on his glasses and reading the citation to himself, he

was asked orally four routine questions, to which he responded; the fifth question, however, was written down, after Ryan expressed an inability to understand, and he responded to that as well, he complied with oral instructions to have his fingerprints and photograph taken, and then he was released from custody.  Id. at 383-85.  As Magistrate  Judge Conroy observed, "Ryan did not request to use a TTY telephone nor any other electronic aid.  This is perhaps because, as the tape reveal[ed], communication between Ryan and the booking officer was effective."   Id. at 390. Judge Conroy continued that "the presence of Ryan's son [to interpret,] or the provision of auxiliary aids would not have changed the booking process in any way." Id. (citation omitted).  Ryan was unrestrained and exhibited no discomfort, and he could "not point to any injury nor denial of the benefits of any program or services an able bodied person would have received." Id.  Accordingly, Judge Conroy held that the "means and methods of communication employed by the defendant State Police did not violate the ADA . . . ." Id.

Some eight months ago, U.S. Magistrate Judge Shirley Padmore Mensah, in the Eastern District of Minnesota, held that gestures, hand-written notes, verbal communication, and the use of a laptop computer to communicate with an arrestee, who then composed a written record of his statements and admitted that what he wrote would have been the same as a statement made if an interpreter was present, was effective communication.  McDonald v. Weissenborn, No. 4:11-CV-768-SPM, 2013 WL 121430, at *3-11 (E.D. Mo. Jan. 9, 2013). In that case, although McDonald requested an interpreter after his arrest, he could communicate using written English and could read, write, speak, and type, with some limitations with vocabulary, syntax, grammar, and spelling. Id. at *8. McDonald testified that he communicates through hand written notes with a fellow inmate who does not know ASL, and McDonald admitted everything in his written statement which was "a complete and

accurate account of his crimes[,]" that McDonald never sought to add to or change.  Id. at

*8-9.  Magistrate Judge Mensah commented that "it is likely that in many cases, a sign

language interpreter will be necessary to establish effective communication with a hearing-

impaired arrestee during custodial interrogation."  Id. at *11.  But in that case, where the

plaintiff "admitted that the information communicated during the interrogation was accurate

and complete," the plaintiff would have communicated the same information with an

interpreter, and plaintiff "failed to point to a single fact in the record showing a lack of

effective communication, [so that] it is clear that effective communication occurred and that

[p]laintiff had meaningful access to the benefits of a custodial interrogation."  Id.[26]

In the present case, as set forth above, there were three stages to the January 8,

2010 incident: first is the execution of the FTA arrest warrant at plaintiff's house (see Section

I.B. supra); second is the approximately ten hour hospital stay in police custody (see Section

---

[26]In Paulone v. City of Frederick, 787 F. Supp. 2d 360 (D. Md. 2011), the plaintiff, a deaf
woman, was stopped for driving while impaired just before midnight, taken to police headquarters,
was transferred at approximately 2:30 a.m. the next morning to the county adult detention center,
and then at 7:00 a.m., appeared before a state court bail commissioner, after which she was
released on bond at 7:23 a.m.; at no time was an interpreter provided to her and all
communications were made by the exchange of written notes.  Id. at 363-65.

The district judge denied both sides' motions for summary judgment, in that there were
factual disputes as to what had transpired for the four-and-one-half hours that plaintiff was held in
the detention center, namely whether the TTY machine was operable (specifically whether it
needed to be recharged over a long period of time when plugged in, as claimed by defendants),
and why the interpreting agency, which had a contract with the county to provide interpreting
services on a twenty-four basis, failed to do so.  Id. at 364 & nn. 4-5, 381-89.

Similarly, the district judge found that there were factual disputes with respect to the less
than thirty minutes that plaintiff spent before the state court bail commissioner, despite the
extended notes exchanged between the plaintiff and the bail commissioner, because English was a
second language for plaintiff and she communicated in "broken English[]"; however, because "the
failure to provide an interpreter was [nothing] other than an unfortunate, isolated occurrence[,]"
and not from "either intentional or deliberate[] indifferen[ce] to [plaintiff's] rights under the ADA,"
summary judgment was granted for defendants on that claim. Id. at 392-99.

Unlike the plaintiff in Paulone, English is plaintiff's native language and he wrote in
complete sentences with proper spelling.  (Tr. Vol. 2, at 39).

I.C. supra); and third is the transportation for "booking and processing" at the detention facility (see Section I.D supra).[27]   As discussed above, under the ADA, law enforcement officers have a duty to "provide arrestees who are disabled with reasonable accommodations once an arrest of a disabled person had been accomplished[,]" Ryan, 667 F. Supp. 2d at 389, and case law supports a finding that the ADA applies to post-arrest detention, see Tucker, 539 F.3d at 533, and to police transportation of the arrestee from the scene to the police station.  See Gorman, 152 F.3d at 911-14.

1. ARREST

When Sergeant Sutton and Stroud, along with another officer, arrived at plaintiff's home on January 8, 2010, Sutton and Stroud were aware that plaintiff was deaf, and based on Stroud's three previous interactions with plaintiff, he was aware that plaintiff could communicate with pen and paper correspondence.  (Tr. Vol. 1, A.M., at 13-14, 84-85, 90-91). Stroud first came to plaintiff's house on a complaint to the LCI in June 2009, and during that meeting, as both Stroud and plaintiff testified, plaintiff communicated with Stroud by pen and paper.  (Id. at 13-14, 85).[28]   After meeting plaintiff, Stroud informed his supervisor that plaintiff is deaf, but he did not request any special accommodations because he was able to communicate with plaintiff using pen and paper.  (Id. at 84-85).  Based on this interaction and the "handful" of other times that Stroud went to plaintiff's house between June 2009 and January 2010, Stroud informed Sutton that plaintiff was hearing impaired but that he "did not

---

[27]While plaintiff alleges that he was denied an interpreter when at "New Haven Police headquarters" for "booking and processing[,]" such facility is run by the Judicial Marshals and not the New Haven Police Department, the former of which is not named as a defendant in this case. (Dkt. #1, Exh. A ¶¶ 18-19).

[28]According to plaintiff, he "tried" to write down that he needs an interpreter, and he showed Stroud page six of the phone book to show that he needed an interpreter.  (Id. at 14, 55).

foresee a problem" based on his previous interactions and ability to communicate with him with pen and paper. (Id. at 85, 90-91).[29] Thus, Sutton and Stroud arrived at plaintiff's house around 2:00 p.m. on January 8, 2010 expecting, based on Stroud's previous interactions with plaintiff, to communicate with plaintiff by pen and paper. Plaintiff testified to several versions of what happened next.

Initially, plaintiff testified that when he opened the door, "there was a gentleman there with a piece of paper. He was trying to give me the piece of paper." (Id. at 21). Plaintiff testified that he went to get a piece of paper, and he "wrote down that [he] needed an interpreter, but they grabbed my hands and that's when [he] blacked out." (Id. at 22).[30]

Plaintiff then testified that, "I opened the door and I went to go get a piece of paper to write down that I needed an interpreter but that's when they grabbed my hands. And I remember looking at them grabbing my hands, but after that I blacked out. I passed out." (Tr. Vol. I, A.M., at 23). He continued, "I was trying to write down because I have a piece of paper that I - - and I was trying to write down 'interpreter' when I saw them, but - - I tried to tell them but nothing happened. . . . They had grabbed my hands and that's when I blacked out." (Id. at 24). This version does not include a request for an interpreter.

On cross examination, plaintiff clarified that he "was writing on a piece of paper to ask

---

[29]Additionally, prior to this January 8, 2010 incident, in late June 2009, plaintiff received a violation letter from LCI, after which he requested an appointment to discuss the contents of the letter, informed the City that he is deaf, and requested a sign language interpreter. (Id. at 15; Exh. 1). Plaintiff acknowledged that he received a handwritten note asking him to contact an interpreter that Michelle Duprey, on behalf of the City, arranged for through the State Commission on the Deaf and Hearing Impaired, but plaintiff also acknowledged that he would not contact this interpreter to assist him because "the City is responsible . . . , not me." (Id. at 15-16, 55-57; Tr. Vol. 1, P.M, at 14-15).

[30]Plaintiff denies that there was any "writing back and forth[.]" (Tr. Vol. 1, A.M, at 62).

for an interpreter and they ignored my writing." (Id. at 61).  Then he testified, "I was going to write on a piece of paper.  I was in the midst of writing on a piece of paper, and I was gesturing to them, . . . and then my hands were grabbed." (Id.)(emphasis added).  Finally, he testified, he "was writing to ask for an interpreter and that's what [he] wrote down, and nothing happened." (Id.)(emphasis added).

Conversely, Sutton testified that they "walked up onto the porch[,]" they "knocked on the door[,]" plaintiff "stuck his head out[,]" and Sutton presented plaintiff with the warrant and he read it over the course of about one minute. (Tr. Vol. 2, at 17, 27-28). Then, according to Sutton, plaintiff came out onto the porch and they "began a line of communication via paper." (Id. at 27).  Prior to handcuffing plaintiff, the two of them communicated back and forth with pen and paper, which they exchanged approximately three times. (Id. at 21, 28-29, 33).  Sutton wrote down "[b]ascially . . . [their] reason for being there; that I was there to basically serve the warrant; that he was going to be taken into custody." (Id. at 29).

Similarly, Stroud testified that there was a "conversation back and forth, Sergeant Sutton explained to [plaintiff] that he would be getting arrested[,]" and that he saw an exchange of notes "go[ing] back and forth[]" between plaintiff and Sutton.  (Tr. Vol.1, A.M., at 91, 93-94). According to Sutton, it did not occur to him to request an interpreter because he had no other reason to speak to plaintiff; plaintiff knew he was under arrest and it was for a housing code violation so that is not something about which Sutton would have further questions for plaintiff. (Tr. Vol. 2, at 21).   In his opinion, plaintiff understood what was happening. (Id.).

As recited above, plaintiff's testimony as to whether he asked for an interpreter is inconsistent.  However, even assuming that he did ask for an interpreter, the testimony of

both Sutton and Stroud evidence that there was effective communication with plaintiff. Plaintiff keeps a pad of paper and pen at his entranceway as a means of communicating with people who come to his home.  (Tr. Vol. 1, A.M., at 24, 61; Tr. Vol. 2, at 17).   He used this pad and pen to communicate with Stroud on several previous occasions, and in his several versions of the events at his home with Sutton and Stroud arrived, plaintiff testified that he was using a pen and pad to write or was going to write to communicate his message. Clearly, plaintiff has the ability to convey messages through pen and paper as a means of communicating.  See Bircoll, 480 F.3d at 1086-87 (plaintiff has the ability to communicate with pen and paper and has used this form of communication in the past).   While understandably this may not be plaintiff's preferred means of communication, he can communicate in this form, and this means of communication is effective, even if the communication was not "perfect[.]"  Id.

In addition to the pen and paper exchange in which Sutton informed plaintiff of the reason for his arrest and that he would be taken into custody, plaintiff was shown the arrest warrant and given the opportunity to read it, which he did.  The warrant clearly showed that his arrest was due to his failure to appear to answer to housing code violations.  (Exh. 3). The substance of the arrest warrant was not complex as it dealt only with a FTA on a housing code violation, and this arrest necessitated no interrogation by police.  See Bircoll, 480 F.3d at 1087.  Additionally, the communication on plaintiff's front porch was done on a "one-on-one" basis with Sutton, and as Stroud testified, plaintiff and Sutton exchanged the pen and paper several times.  Id.  In light of these circumstances, even if plaintiff did request an ASL interpreter, there existed "another effective, but not burdensome, method of communication[.]"  Id.   Thus, while there are times when a sign language interpreter is necessary to establish effective communication with a hearing-impaired arrestee, in this case,

where plaintiff communicated with the arresting officer by pen and paper prior to his arrest, was informed of the reason for the arrest, and read the arrest warrant that showed that he would be taken into custody, it is clear that effective communication occurred at the time of plaintiff's arrest. See McDonald, 2013 WL 121430, at *3-11.

### 2. HOSPITAL STAY

Stroud and Sutton both testified that while being handcuffed, plaintiff "lowered himself to the ground" and blacked out or passed out; he was then transported to YNHH. (Tr. Vol. 1, A.M., at 91-92; Tr. Vol. 2, at 29-30, 33. Plaintiff testified that he believes he remembers walking to an ambulance but he was "very disoriented[]" (Tr. Vol. 1, A.M., at 24), and he next remembers waking up in a hospital bed. (Tr. Vol. 1, A.M., at 24-25; see id. at 63). The testimony elicited at trial from both plaintiff and Officer Kyle establish that there was effective communication during plaintiff's ten-hour hospital stay, even though he requested an ASL interpreter from the hospital and did not receive one until the end of his hospital stay.

When Officer Kyle arrived at his post to guard plaintiff while he was in the hospital, he did not know that plaintiff was deaf, but once he noticed that plaintiff was becoming increasingly "agitated[,]" he offered plaintiff a pad of paper and pen to communicate. (Tr. Vol. 1, A.M., at 25, 63; Tr. Vol. 2, at 37-38). According to Officer Kyle, the two of them communicated back and forth, during which communication Officer Kyle informed plaintiff that he was there because of an arrest warrant but that he did not know why plaintiff was arrested. (Tr. Vol. 2, at 38). Plaintiff asked Officer Kyle several times why he was arrested. (Id.). While it was "difficult" for plaintiff to maneuver his hands to write while he was handcuffed to the bed, he was able to write that he was concerned about his father and his dogs, and, as both plaintiff and Officer Kyle acknowledged, plaintiff asked Officer Kyle to

contact Detective Billy White, who knew plaintiff, and knew he is deaf.  (Tr. Vol. 2, at 38-39; Tr. Vol. 1, A.M., at 63-64; see Tr. Vol. 1, A.M., at 28).[31]  Plaintiff  "ask[ed] for a live interpreter . . ."  (Tr. Vol. 1, A.M., at 25, 63), and before the arrival of the ASL interpreter, the hospital gave plaintiff a video machine, and his arm restraints were removed so that he could sign, but the video feed kept breaking up so that he could not make use of the machine. (Tr. Vol. 1, A.M., at 26-27, 65-66; Tr. Vol. 2, at 40).   Officer Kyle testified that plaintiff was agitated (see Tr. Vol. 2, at 37-38), but Officer Kyle explained the process to plaintiff, that he would go to the "lock up," and depending on the charge, he could be released on a promise to appear or he would have to wait to be seen by a judge.  (Tr. Vol. 2, at 50).  He also told plaintiff there was a possibility he could get released without a bond. (Id.). Officer Kyle wrote that plaintiff would go in a van and go to 1 Union Avenue for processing.  (Id. at 52). According to Officer Kyle, they wrote on three or four pages of Officer Kyle's police pad, and filled an entire sheet of paper that the nursing staff provided. (Id. at 51).   Plaintiff wrote in complete sentences with proper spelling and they communicated until Officer Kyle told plaintiff that he would be transported to Union Avenue for processing, at which time plaintiff became agitated and threw the pen and paper.  (Tr. Vol. 2, at 39, 52).  Once again, while not the mode of communication requested by plaintiff, plaintiff was able to communicate with pen and paper, one-on-one with Officer Kyle, while he remained detained in the hospital.  See Bircoll, 480 F.3d at 1087.  Plaintiff contends that during the ten hours that he was restrained in the bed, no one told him why he was arrested (Tr. Vol.1, A.M., at 27), so he started panicking, was scared, and he felt his heart pounding (id. at 27-29), and Officer Kyle testified that he did not tell plaintiff why he was arrested

_____

[31]See note 17 supra.

because he did not know.  (Tr. Vol. 2, at 38).  Plaintiff was not denied this information

because of his disability.  As Officer Kyle explained, in his role as a guarding officer, he is not

told why the arrestee is under arrest.  (Id.).  Thus, plaintiff was not treated any differently

than hearing arrestees.  Moreover, although plaintiff testified that he was told that he was

arrested for a traffic ticket (Tr. Vol. 1, A.M., at 34), as discussed above, Sutton and Stroud

testified that when they arrived at plaintiff's house on January 8, Sutton handed plaintiff the

arrest warrant, which plaintiff read, and then Sutton and plaintiff proceeded to communicate

back and forth by pen and paper.  (See Section I.B. supra).  Thus, plaintiff's testimony

relating to a lack of information about his arrest, or misinformation about his arrest, is not

credible.

        When the ASL interpreter arrived, the interpreter explained to plaintiff that he would

be admitted to the hospital because of problems with his heart.  (Tr. Vol. 1, A.M., at 29).  At

that point, plaintiff had already been informed by Officer Kyle that after he was released from

the hospital, he would be transported to Union Avenue.  (Tr. Vol. 2, at 52). Even with that

information conveyed, plaintiff signed himself out against medical advice.  (Id.; see Tr. Vol.

1, A.M., at 29).

### 3. TRANSPORT

        Plaintiff and Officer Kyle consistently testified that when plaintiff signed himself out

of the hospital against medical advice, plaintiff was handcuffed with his hands in front of him

and he was first placed in the back seat of a police car for about fifteen minutes before being

placed in the back of a police van that would transport him to the detention facility less than

one mile away.  (Tr. Vol. 1, A.M., at 30-31; Tr. Vol. 2, at 41-42).  While Officer Kyle did not

notice anything out of the ordinary when he placed plaintiff in the van (Tr. Vol. 2, at 42),

plaintiff testified that he resisted, he became very scared, his heart was racing, he thought

27

gas was coming out of the vents in the van, he banged on the sides for help, and he lost control of his bodily functions.  (Tr. Vol. 1, A.M., at 32-33).  Eventually, after what plaintiff felt like was an hour, he felt the vibration of the van moving, and less than one mile later, he arrived at the detention facility.  (Id. at 33).

Plaintiff testified that no one communicated with him during this time. (Id.).  Officer Kyle testified that he explained to plaintiff that he would be transported to 1 Union Avenue for processing; however, that information had been conveyed while plaintiff was still handcuffed to the bed, and not as they were leaving the hospital.  (Tr. Vol. 2, at 50-51).[32] According to Officer Kyle, when he told plaintiff that he would be transported to the detention facility, plaintiff became agitated and threw the pen and paper.  (Id. at 52).  This reaction was consistent with the actions described by plaintiff when he was placed in the van.  Plaintiff does not argue that plaintiff should have received further communication from the officer when leaving the hospital or when being placed in the van, but rather, contends that "plaintiff had a reasonable expectation that the police procedure would be explained to him by Officer Kyle while a sign language interpreter was available at the hospital."  (Dkt. #68, at 11). However, having found that Officer Kyle engaged in effective communication with plaintiff by way of their pen and paper exchange over a five hour period, during which the police process was explained, plaintiff would not have a reasonable expectation that the ASL interpreter brought in by the hospital would sua sponte elicit further information about police procedure that had already been explained to plaintiff.[33]

---

[32]In his post-trial brief, plaintiff assumes that "[i]f he had been properly informed by Officer Kyle, it is highly unlikely that he would have taken the step to sign himself out of the facility." (Dkt. #68, at 11).

[33]Nor was there any testimony that plaintiff inquired, through the interpreter, about the police procedure, or expressed any misunderstanding of what had been explained by Officer Kyle.

<u>III. CONCLUSION</u>

Accordingly, for the reasons stated above, the Clerk shall enter <u>judgment in favor of</u> <u>defendant</u>.

Dated this 16th day of September, 2013, at New Haven, Connecticut.

/s/ Joan G. Margolis, USMJ
Joan G. Margolis
United States Magistrate Judge